WYNN, Circuit Judge, dissenting:
 

 After a jury convicted Defendant Quintin Antonio Bell ("Defendant") of several drug and firearms offenses, the U.S. District Court for the District of Maryland sentenced Defendant to what the court determined was the mandatory minimum of 480 months' imprisonment. On appeal, Defendant lodges numerous challenges to his convictions and sentence, asserting, among other claims, that the district court (1) reversibly erred in admitting inculpatory statements made by Defendant obtained
 in violation of his rights under
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966), and (2) incorrectly imposed a mandatory minimum sentence under the Armed Career Criminal Act ("ACCA"),
 
 18 U.S.C. § 924
 
 (e)(1), based on Defendant's two prior Maryland armed robbery convictions. I agree with both assertions.
 

 My good colleagues in the majority conclude that the district court properly rejected Defendant's
 
 Miranda
 
 argument because Defendant did not make his inculpatory statements in response to "interrogation" by a law enforcement officer.
 
 Ante
 
 at 462-64. In particular, like the district court, my colleagues conclude that because the law enforcement officer testified that he
 
 intended
 
 to direct the question to which Defendant responded to
 
 Defendant
 
 's
 
 wife
 
 -who was seated "in close proximity" to Defendant when the officer asked the question-
 
 Defendant
 
 was not subject to "express questioning," therefore rendering
 
 Miranda
 
 inapplicable. But, under
 
 Miranda
 
 , our assessment of whether Defendant was subject to "interrogation" must be analyzed from the
 
 perspective of Defendant
 
 , not the officer who questioned Defendant. Therefore, as explained below, the district court erred by treating as dispositive the officer's testimony that he intended to, and did in fact, direct the question to Defendant's wife.
 

 Additionally, regarding Defendant's sentence, my colleagues in the majority conclude that Defendant's prior Maryland armed robbery convictions had "as an element the use, attempted use, or threatened use of physical force
 
 against the person of another
 
 ," as Section 924(e)(1) requires, notwithstanding that Maryland appellate decisions, which remain good law, provide that armed robbery can be committed solely by use or threatened use of force
 
 against property
 
 .
 
 See, e.g.
 
 ,
 
 Giles v. State
 
 ,
 
 8 Md.App. 721
 
 ,
 
 261 A.2d 806
 
 , 807 (1970). The majority opinion disregards those state court decisions on grounds that the discussion of threats against property amounted to "dicta" and that, under Maryland law, armed robbery typically involves violence against persons.
 
 Ante
 
 at 471-72. But this Court and other courts routinely rely on dicta from state court opinions in determining whether a state offense constitutes a predicate offense for purposes of the ACCA. And this Court has held that when a state offense allowed for conviction solely based on harm to property, the offense did not constitute a crime of violence, even though state law established that the offense was "primar[il]y" intended to protect persons.
 
 See
 

 United States v. Parral-Dominguez
 
 ,
 
 794 F.3d 440
 
 , 445-46 (4th Cir. 2015). Therefore, as explained below, the district court erred regarding Defendant's sentence.
 

 Regarding the resolution of these issues by the majority opinion, I respectfully dissent.
 
 [1]
 

 I.
 

 First, the district court erred in refusing to suppress statements Defendant made while in custody, in violation of his Fifth Amendment rights as protected by the prophylactic rule in
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 , 444,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966).
 
 Miranda
 
 requires "law enforcement to inform individuals who are [1] in custody of their Fifth Amendment rights prior to [2] interrogation."
 
 United States v. Hashime
 
 ,
 
 734 F.3d 278
 
 , 282 (4th Cir. 2013). "We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations de novo. When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government."
 

 Id.
 

 (quotation omitted).
 

 A.
 

 In ruling on Defendant's suppression motion, the district court principally relied on the testimony of Bureau of Alcohol, Tobacco, & Firearms Special Agent Frank Oliver, which the court found credible. On April 20, 2014-after a Prince George's County Emergency Services Team had "clear[ed] [Defendant's] home, ma[d]e sure it [wa]s safe," and accounted for all individuals-Special Agent Oliver entered Defendant's home to execute a "no knock" search warrant for, among other things, firearms and drugs. J.A. 265, 272. Special Agent Oliver sought and obtained a "no knock" search warrant so as to surprise
 Defendant and thereby render him in "a state of confusion that w[ould] eliminate the possible use of a firearm." J.A. 61. Special Agent Oliver entered directly into the home's living room, where he found Defendant's wife seated handcuffed in a chair. Emergency Services Team members then brought Defendant, who also was handcuffed, into the living room as well. Defendant was placed in another chair in the living room, which Special Agent Oliver testified was "in close proximity" to the chair in which Defendant's wife was seated. J.A. 278, 282.
 

 Without advising Defendant of his Fifth Amendment rights, Special Agent Oliver then informed Defendant's wife of the search warrant and "asked her if there [were] any weapons or anything that would hurt an officer." J.A. 266. According to Special Agent Oliver's testimony, when he asked that question, he "directed" the question to Defendant's wife, "looking at her in the eye." J.A. 282. Special Agent Oliver did not preface either the statement or the question by stating Defendant's wife's name or instruct only her to answer. J.A. 282-83. Immediately after Special Agent Oliver asked the question, Defendant "spoke up and said there as a gun under the couch." J.A. 391;
 
 see also
 
 J.A. 267. Defendant further stated that a "friend had given him the gun because somebody had tried to break into the house and rob him." J.A. 268.
 

 Defendant moved to suppress his statements regarding the gun-a Mini-14 Ruger .223 caliber rifle that served as the basis of Defendant's firearms convictions-under
 
 Miranda
 
 . The parties agreed-and the district court concluded-that Defendant was "in custody" for purposes of
 
 Miranda
 
 when he made the statements. The parties disagreed, however, as to whether Defendant was subject to "interrogation" for purposes of
 
 Miranda
 
 when he made the statements regarding the gun. Ruling from the bench, the district court held that Defendant "was not being interrogated" when he made the statements. J.A. 392. The district court's
 
 entire
 
 explanation for that legal conclusion is as follows:
 

 Regarding the April 10, 2014 statement in the house, defendant's primary argument is that the question regarding firearms in the house was actually directed at him and not his wife. I do credit, as a factual matter and as a legal matter, Agent Oliver's testimony that he did direct the question at Ms. Bell and that the defendant then volunteered an answer.
 

 Id.
 

 B.
 

 In
 
 Rhode Island v. Innis
 
 , the Supreme Court held that a person is subject to "interrogation" for purposes of
 
 Miranda
 
 "whenever a person in custody is subject to either express questioning
 
 or
 
 its functional equivalent."
 
 446 U.S. 291
 
 , 301,
 
 100 S.Ct. 1682
 
 ,
 
 64 L.Ed.2d 297
 
 (1980) (emphasis added);
 
 see also
 
 id.
 

 ("[T]he term 'interrogation' under
 
 Miranda
 
 refers
 
 not only to express questioning
 
 , but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." (emphasis added) ).
 
 Innis
 
 made clear that "express questioning" and the "functional equivalent" of express questioning constitute distinct "prong[s]" of the interrogation inquiry.
 

 Id.
 

 at 302
 
 ,
 
 100 S.Ct. 1682
 
 ;
 
 see also
 

 Smiley v. Thurmer
 
 ,
 
 542 F.3d 574
 
 , 582 (7th Cir. 2008) ("It is clear from the language, facts and context of
 
 Innis
 
 , that the Supreme Court defined interrogation as (1) express questioning; or (2) its functional equivalent.");
 
 United States v. Brown
 
 ,
 
 720 F.2d 1059
 
 , 1067 (9th Cir. 1983) ("[U]nder
 
 Innis
 
 , interrogation within
 
 Miranda
 
 's requirements
 applies (1) to express questioning or (2) to the 'functional equivalent' thereof.").
 

 Although
 
 Innis
 
 did not expand upon what constitutes "express questioning"-perhaps because that "prong" of the interrogation inquiry was not at issue in the case,
 
 446 U.S. at 302
 
 ,
 
 100 S.Ct. 1682
 
 -the Supreme Court did go into greater depth regarding the "functional equivalent" prong. That prong encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."
 

 Id.
 

 at 301
 
 ,
 
 100 S.Ct. 1682
 
 . Importantly, that inquiry "focuses primarily upon the
 
 perceptions of the suspect
 
 , rather than the intent of the police."
 

 Id.
 

 (emphasis added).
 

 Following
 
 Innis
 
 , lower courts-including this Court-have concluded that
 
 Innis
 
 likewise requires that courts assess whether a defendant was subject to "express questioning"
 
 from the perspective of the suspect
 
 , and not based on the subjective intent of the law enforcement officer engaged in the questioning. For instance, relying on
 
 Innis
 
 's discussion of the "functional equivalent" prong, the District of Columbia Circuit held that the determination of whether an individual was subjected to express questioning "is an objective inquiry; the subjective intent of the officer is relevant
 
 but not dispositive
 
 ."
 
 United States v. Bogle
 
 ,
 
 114 F.3d 1271
 
 , 1275 (D.C. Cir. 1997) (emphasis added);
 
 see also
 

 United States v. Johnson
 
 ,
 
 734 F.3d 270
 
 , 276 (4th Cir. 2013) (examining whether "express questioning" amounted to
 
 Miranda
 
 interrogation from the "suspect's point of view");
 
 United States v. Cowan
 
 ,
 
 674 F.3d 947
 
 , 958 (8th Cir. 2012) ("A question is an interrogation if it is reasonably likely to elicit incriminating information." (internal quotation marks omitted) );
 
 United States v. Allen
 
 ,
 
 13 F.3d 105
 
 , 109 (4th Cir. 1993) (relying on
 
 Innis
 
 's objective test to determine whether "express questioning" constituted interrogation for purposes of
 
 Miranda
 
 ). Put differently, "the test for determining whether a suspect was subjected to interrogation is whether a reasonable objective observer would believe an officer's express questioning [was] reasonably likely to elicit an incriminating response."
 
 United States v. Johnson
 
 ,
 
 680 F.3d 966
 
 , 976 (7th Cir. 2012) (internal quotation marks and alterations omitted),
 
 overruled on other grounds by
 

 Fowler v. Butts
 
 ,
 
 829 F.3d 788
 
 (7th Cir. 2016). "The focus is on the
 
 suspect's perceptions
 
 rather than the intent of the police."
 

 Id.
 

 (emphasis added).
 

 The extension of
 
 Innis
 
 's objective, suspect-focused inquiry to the express questioning prong makes sense.
 
 Innis
 
 explained, for example, that the interrogation inquiry focuses on the "perceptions of the suspect, rather than the intent of the police" because "the
 
 Miranda
 
 safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices,
 
 without regard to objective proof of the underlying intent of the police.
 
 "
 
 446 U.S. at 301
 
 ,
 
 100 S.Ct. 1682
 
 . That rationale is no less applicable to an express question than it is to the functional equivalent thereof.
 

 That is particularly true in circuits, like this circuit, which recognize the possibility that a suspect can face "express questioning" without being subject to "interrogation" for purposes of
 
 Miranda
 
 , if the questions "are not reasonably likely to elicit incriminating responses."
 
 Johnson
 
 , 734 F.3d at 276.
 
 But see
 

 Smiley
 
 ,
 
 542 F.3d at 583
 
 (holding that because the defendant was subject to "express questioning," the lower court should not have considered whether question was reasonably likely to elicit an incriminating response). If, as this
 Court holds, a defendant can be exempted from
 
 Miranda
 
 's protections on grounds that the express questions he faced were "not reasonably likely to elicit incriminating responses,"
 
 Johnson
 
 , 734 F.3d at 276 -
 
 Innis
 
 's test for whether police action amounts to the functional equivalent of express questioning-then
 
 Innis
 
 requires that the express questioning assessment be made from the suspect's perspective.
 

 Because whether a suspect was subject to express questioning must be examined from the perspective of the suspect, the district court committed legal error in denying Defendant's motion to suppress his un-
 
 Mirandized
 
 inculpatory statements.
 

 The district court rested its decision
 
 entirely
 
 on "Agent Oliver's testimony that he did direct the question at Ms. Bell," not at Defendant. J.A. 392. But nowhere in the district court's oral ruling, or its earlier oral factual findings, did the district court consider the relevant question: whether a reasonable suspect in Defendant's position would have believed that Special Agent Oliver's question was directed at Defendant. Notably, the district court failed to address that dispositive question, even though Defendant's counsel repeatedly argued that the court should do so.
 
 See, e.g.
 
 , J.A. 337-38 (arguing that "[i]t really doesn't even matter as to what Agent Oliver's subjective intent was" because Defendant "took the question [as] being addressed to him reasonably and answered in response.").
 

 That legal error is significant because the factual record includes evidence that could allow a factfinder to conclude that a reasonable suspect in Defendant's position would have believed that the question was directed at him. In particular, as my colleagues in the majority acknowledge, at the time of the questioning Defendant "was seated in 'another chair off to the right, behind [his wife's] chair,' and the two chairs were 'in close proximity' to each other."
 
 Ante
 
 at 462. Even though Special Agent Oliver
 
 intended
 
 to-and, according to his unrebutted testimony, did in fact-
 
 direct
 
 the question to Defendant's wife, a person seated directly "behind" and "in close proximity" to Defendant's wife, as Defendant was, may have reasonably believed that Special Agent Oliver was directing the question to him or to both he
 
 and
 
 his wife.
 

 For the same reason, a factfinder could conclude that an officer in Special Agent Oliver's position "should have known" that directing a question at Defendant's wife, when Defendant was seated directly "behind" and "in close proximity" to her, was "reasonably likely to elicit an incriminating response" from Defendant.
 
 Innis
 
 ,
 
 446 U.S. at 302
 
 ,
 
 100 S.Ct. 1682
 
 . That is particularly true given that Special Agent Oliver (1) testified that he did not preface either his initial statement about the search warrant or the question regarding weapons by stating Defendant's wife's name, nor did he instruct only her to answer, and (2) obtained a "no knock" warrant so as to place Defendant in a "state of confusion" at the time of the questioning. J.A. 61. Put differently, Special Agent Oliver's testimony in no way precludes a finding that a reasonable person in Defendant's position would have believed that the question was directed at him-the dispositive issue never addressed by the district court.
 

 That Special Agent Oliver's question-whether "there [were] any weapons in the house"
 
 [2]
 
 -was "directly relevant to the substantive
 offense charged" provides further evidence that the question was "reasonably likely to elicit incriminating information," and therefore constituted interrogation for purposes of
 
 Miranda
 
 .
 
 Cowan
 
 ,
 
 674 F.3d at 958
 
 (internal quotation marks omitted);
 
 see also, e.g.
 
 ,
 
 United States v. Williams
 
 , 227 Fed. App'x 307, 311 (4th Cir. 2007) (holding that question amounted to "interrogation" for purposes of
 
 Miranda
 
 when law enforcement officer "should have known that any response to his questions would likely implicate [the defendant] in the" offense under investigation).
 

 Here, Special Agent Oliver was investigating Defendant for drug and firearms offenses and expressly sought and obtained a warrant to seize any firearms found in his search of the residence. Accordingly, contrary to the majority opinion's conclusion, Special Agent Oliver's question was "directly relevant to the substantive offense charged,"
 
 Cowan
 
 ,
 
 674 F.3d at 958
 
 , and therefore reasonably "likely to elicit from [Defendant] a statement implicating himself in the illegal possession of a firearm,"
 
 ante
 
 at 463.
 

 Significantly, even if it were appropriate for this Court to independently review the record to determine whether a reasonable person in Defendant's position would have believed the question was directed at him, we cannot do so because the record on appeal omits a crucial piece of evidence bearing on that question. During cross-examination, defense counsel presented Special Agent Oliver with a diagram of the room in which the questioning occurred. At defense counsel's request, Special Agent Oliver made "X" marks on the diagram to indicate in which chairs Defendant and his wife were seated and where those chairs were located in the room. That marked diagram is not part of the record on appeal, nor was it preserved by the district court.
 

 Additionally, during oral argument on the suppression motion-which occurred more than a week after Special Agent Oliver's testimony-the district court expressed confusion regarding where, exactly, Defendant and his wife were seated relative to each other. J.A. 359 ("I looked back in my notes and, even then, I wasn't hundred percent sure [i]n terms of who is seated where at the time the question is being asked."). The record includes no indication that the district court ever resolved that uncertainty, which bears directly on whether Defendant reasonably believed, based on his proximity relative to his wife, that the question was directed at him. In such circumstances, this Court should, at a minimum, remand the case to the district court to determine whether, under the proper legal standard, Defendant's inculpatory statements should have been suppressed.
 
 [3]
 

 II.
 

 I also disagree with my colleagues' conclusion that Defendant's two 1985 Maryland convictions for "robbery with a deadly weapon" qualified as predicate convictions supporting enhancement of Defendant's sentence Section 924(e) of the ACCA. "[W]e review de novo the question whether his prior state convictions qualified as predicate felony convictions for purposes of a federal sentence enhancement."
 
 United States v. Gardner
 
 ,
 
 823 F.3d 793
 
 , 801 (4th Cir. 2016) (internal quotation marks and alterations omitted).
 

 The ACCA subjects a defendant to substantial mandatory minimum sentences if the defendant has three prior convictions for "violent felon[ies]."
 
 18 U.S.C. § 924
 
 (e)(1) The ACCA's "force clause" provides, in pertinent part, that a crime is a "violent felony" if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." § 924(e)(2)(B)(i). Only "violent force-that is, force capable of causing physical pain or injury to another person"-satisfies the "physical force requirement."
 
 Johnson v. United States
 
 ,
 
 559 U.S. 133
 
 , 140,
 
 130 S.Ct. 1265
 
 ,
 
 176 L.Ed.2d 1
 
 (2010). In determining whether a prior offense constitutes a violent felony for purposes of the force clause, we apply the "categorical approach," under which we "must determine whether the state crime of conviction
 
 by its elements
 
 "-
 
 i.e.
 
 not under the particular facts underlying a defendant's prior conviction-necessarily "involves the 'the use, attempted use, or threatened use of physical force against the person of another.' "
 

 United States v. Reid
 
 ,
 
 861 F.3d 523
 
 , 527 (4th Cir. 2017). We look to state law to make that determination.
 
 Gardner
 
 ,
 
 823 F.3d at 803
 
 . In engaging in that analysis, we first look to decisions of the State's highest court, with decisions of a State's intermediate appellate court "constitut[ing] the next best indicia of what state law is."
 

 Id.
 

 (quoting
 
 Castillo v. Holder
 
 ,
 
 776 F.3d 262
 
 , 268 & n.3 (4th Cir. 2015) ).
 

 Defendant argues that his two 1985 Maryland convictions for armed robbery do not constitute "violent felonies" because, under Maryland law, a defendant can commit armed robbery through use or threatened use of violent force solely against
 
 property
 
 , and therefore that the offense does not categorically require use of force "against the
 
 person
 
 of another," as Section 924(e)(2)(B)(i) requires. In an analogous context, this Court held that when an offense can be committed through use or threatened use of violence against
 
 property
 
 alone, then the offense does not fall within language identical to that of the force clause.
 
 Parral-Dominguez
 
 ,
 
 794 F.3d at 445
 
 .
 

 Under Maryland common law, to convict a defendant of armed robbery, the State must prove that the defendant (1) committed simple "robbery" while (2) using a "dangerous or deadly weapon."
 
 Williams v. State
 
 ,
 
 302 Md. 787
 
 ,
 
 490 A.2d 1277
 
 , 1280 (1985). Simple robbery is "the felonious taking and carrying away of the personal property of another from his person by the use of violence
 
 or
 
 by putting in fear."
 

 Id.
 

 (emphasis added). In two opinions, an intermediate Maryland appellate court held that the "fear" element of simple robbery may be satisfied by "fear ... of injury to the person
 
 or to property
 
 , as for example, a threat to burn down a house."
 
 Giles
 
 ,
 
 261 A.2d at 807-08
 
 (emphasis added);
 
 Douglas v. State
 
 ,
 
 9 Md.App. 647
 
 ,
 
 267 A.2d 291
 
 , 295 (1970) ("That the fear be of great bodily harm is not a requisite.
 
 Nor need the fear be of bodily injury at all
 
 ." (emphasis added) ). Neither of those holdings has been overturned. In a separate case, the Government conceded that, under
 
 Giles
 
 and
 
 Douglas
 
 , simple robbery-a constituent element of armed robbery-did not constitute a crime of violence because it encompassed "threats against property," not simply "against the person of another," as the force clause requires.
 
 United States v. Baten
 
 , No. 04-CR-0256, Docket No. 23 (D. Md. Nov. 16, 2015).
 

 Notwithstanding its prior concession as to simple robbery, the Government now argues-and the majority opinion agrees,
 
 ante
 
 at 471-72-that
 
 Giles
 
 's and
 
 Douglas
 
 's statements that robbery can be accomplished by threats to property are not dispositive because neither case involved a threat to property, rendering the statements dicta. But neither the Government nor the majority opinion identifies any controlling authority holding that we should disregard dicta in ascertaining whether a state law constitutes a crime of violence.
 

 To the contrary, this Court and other Circuits previously have relied on dicta in state court opinions in determining whether a state offense crime was a "violent felony" for purposes of the ACCA. For example, in
 
 United States v. Aparicio-Soria
 
 ,
 
 740 F.3d 152
 
 (4th Cir. 2014) (en banc), this Court expressly relied on dicta in determining whether a state offense categorically constituted a "crime of violence" for purposes of the sentencing guidelines,
 

 id.
 

 at 157-58 & n.4 ;
 
 see also
 

 id.
 

 at 164
 
 (Wilkinson, J., dissenting) (noting that language in state opinion relied on by majority was dicta). Other circuits have taken the same approach.
 
 See, e.g.
 
 ,
 
 United States v. Vail-Bailon
 
 ,
 
 868 F.3d 1293
 
 , 1304 (11th Cir. 2017) (relying on dicta in state court opinion in determining whether state offense was "crime of violence");
 

 id.
 

 at 1322
 
 (Rosenbaum, J. dissenting) (noting that state decision relied on by majority was dicta);
 
 United States v. Smith
 
 ,
 
 582 F. App'x 590
 
 , 596 & n.5 (6th Cir. 2014) (relying on dicta in state court opinion in determining whether North Carolina common law robbery was a crime of violence because courts should "defer to the North Carolina Supreme Court on the interpretation of North Carolina law"),
 
 vacated on other grounds
 
 --- U.S. ----,
 
 135 S.Ct. 2930
 
 ,
 
 192 L.Ed.2d 967
 
 (2015).
 

 Accordingly, that the language in
 
 Giles
 
 and
 
 Douglas
 
 was dicta in no way bars this Court from considering it in determining whether Maryland armed robbery constitutes a violent felony under the ACCA's force clause. Indeed, because
 
 Giles
 
 and
 
 Douglas
 
 remain good law, lower Maryland courts are bound to convict a defendant of robbery if the defendant solely threatens the victim's property, not his person. In such circumstances, it makes no sense to disregard
 
 Giles
 
 's and
 
 Douglas
 
 's description of the fear element as dicta.
 

 Notwithstanding the
 
 express
 
 language in
 
 Giles
 
 and
 
 Douglas,
 
 my colleagues in the majority rely upon the supposed silence of two Maryland appellate decisions post-dating Defendant's convictions that describe the "fear" element of robbery
 
 without
 
 reference to threats to property.
 
 Ante
 
 at 471-72 (citing
 
 Spencer v. State
 
 ,
 
 422 Md. 422
 
 ,
 
 30 A.3d 891
 
 , 898 (2011) and
 
 Snowden v. State
 
 ,
 
 321 Md. 612
 
 ,
 
 583 A.2d 1056
 
 , 1059 (1991) ). But
 
 Spencer
 
 and
 
 Snowden
 
 involved defendants who threatened or inflicted bodily harm, meaning that neither court needed to consider the standard for putting a victim in fear through harming or threatening to harm property.
 
 Spencer
 
 ,
 
 30 A.3d at
 
 893 ;
 
 Snowden
 
 ,
 
 583 A.2d at 1057
 
 . And neither opinion addressed whether harm to property could satisfy the "fear" element, much less overruled
 
 Giles
 
 's and
 
 Douglas
 
 's earlier unambiguous statements that threats to property could satisfy that element. Additionally, both opinions post-date Defendant's conviction, meaning that the could not have implicitly abrogated, much less overruled,
 
 Giles
 
 and
 
 Douglas
 
 at the time of Defendant's conviction.
 

 The majority opinion also relies on a Maryland Court of Appeals decision that post-dates Defendant's convictions:
 
 West v. State,
 

 312 Md. 197
 
 ,
 
 539 A.2d 231
 
 (1988). But, if anything,
 
 West
 
 supports Defendant's contention that a defendant can be convicted of armed robbery without using or threatening to use violent force against the person of another. In particular,
 
 West
 
 holds that a defendant can be convicted of robbery based on the application of "constructive" force "by intimidation or placing the victim in fear."
 

 Id.
 

 at 234
 
 . As
 
 Giles
 
 explains, a defendant can place a victim in fear by threatening the victim's property-e.g., "threat[ening] to burn down a house"-without ever applying physical force against the person of the victim, as the force clause demands.
 
 Giles
 
 ,
 
 261 A.2d at 807-08
 
 . That, in such a case, the victim is in fear that violent force will be applied against his
 
 property
 
 in no way establishes that his
 
 person
 
 was subject to "force capable of causing physical pain or injury," as the force clause requires.
 
 See
 

 Johnson
 
 ,
 
 559 U.S. at 140
 
 ,
 
 130 S.Ct. 1265
 
 . Accordingly, contrary to the majority opinion's suggestion,
 
 West
 
 is entirely consistent with
 
 Giles
 
 and
 
 Douglas
 
 .
 

 That Defendant committed armed, as opposed to simple, robbery also does not change this conclusion. The majority opinion implies that this Court should not treat Maryland armed robbery as a violent felony because there is not a "realistic probability"-but rather only a "theoretical possibility"-that a suspect can commit armed robbery by harming or threatening to harm property.
 
 See
 

 ante
 
 at 472 (quoting
 
 Moncrieffe v. Holder
 
 ,
 
 569 U.S. 184
 
 , 191,
 
 133 S.Ct. 1678
 
 ,
 
 185 L.Ed.2d 727
 
 (2013) ).
 

 Even assuming it is possible to draw an enforceable line between a "realistic probability" and "theoretical possibility"-which the majority opinion makes no effort to do-it takes little "legal imagination" to conceive of how a defendant could use a weapon to inflict or threaten harm to a victim's property without threatening the victim's person.
 
 Moncrieffe
 
 ,
 
 569 U.S. at 191
 
 ,
 
 133 S.Ct. 1678
 
 . Maryland courts already have
 
 expressly provided an example
 
 : "threat[ening] to burn down a house."
 
 Giles
 
 ,
 
 261 A.2d at 807-08
 
 . And there are numerous cases in which other courts have recognized that a suspect can commit robbery or armed robbery, under legal frameworks materially indistinguishable from Maryland common law armed robbery, by threatening a victim's
 
 property
 
 as opposed to his person.
 
 See, e.g.
 
 ,
 
 United States v. O'Connor
 
 ,
 
 874 F.3d 1147
 
 , 1154 (10th Cir. 2017) (holding that Hobbs Act robbery constitutes violent felony because for example, a suspect could commit a Hobbs Act robbery by saying to a victim, "If you don't give me $1 million, I won't hurt you, but I'll blow up an empty building you own");
 
 U.S. v Becerrill-Lopez
 
 ,
 
 541 F.3d 881
 
 , 891 (9th Cir. 2008) (holding that defendant could be convicted of violating California robbery statute by making "mere threats to property, such as 'Give me $10 or I'll key your car' or 'Open the cash register or I'll tag your windows' ");
 
 People v. Gallegos
 
 ,
 
 193 Colo. 108
 
 ,
 
 563 P.2d 937
 
 , 938 (1977) (en banc) (holding defendant committed attempted "robbery by threat" when defendant "threat[ened] to blow up a Greeley business unless its owner paid him $100").
 

 Importantly, none of the three opinions of our sister circuits concluding that Maryland robbery constitutes a violent felony under the force clause or statutory language similar thereto are binding on this Court.
 
 See
 

 ante
 
 at 472 (citing
 
 UnitedStates v. Redrick
 
 ,
 
 841 F.3d 478
 
 , 485 (D.C. Cir. 2016) ;
 
 United States v. Warren
 
 , 723 Fed. App'x 155, 165 (3d Cir. 2018) (unpublished);
 
 United States v. Segovia
 
 ,
 
 770 F.3d 351
 
 , 355 (5th Cir. 2014) ). Indeed, none of the three opinions is persuasive.
 

 Redrick
 
 principally ignored the harm-to-property language in
 
 Giles
 
 and
 
 Douglas
 
 on grounds that that language was dicta.
 
 841 F.3d at 485
 
 . But, as explained above, in this Circuit, we have held, for good reason, that dicta should be considered in determining whether a prior offense constitutes a violent felony.
 
 See
 

 Aparicio-Soria
 
 ,
 
 740 F.3d at
 
 157-58 & n.4.
 
 Redrick
 
 also relies on an intermediate Maryland appellate court decision-which post-dates both of Defendant's convictions-defining assault, which it characterizes as a constituent element of robbery, as the attempted or actual application of force "to the body of the victim."
 
 841 F.3d at 485
 
 (quoting
 
 Lamb v. State
 
 ,
 
 93 Md.App. 422
 
 ,
 
 613 A.2d 402
 
 , 446 (1992) ). But unlike
 
 Giles
 
 and
 
 Douglas
 
 , which expressly dealt with robbery, robbery was not at issue in
 
 Lamb
 
 , meaning that
 
 Lamb
 
 could not have abrogated
 
 Giles
 
 's and
 
 Douglas
 
 's statement that the fear element for robbery encompasses harm or threats to property. Given this material distinction, it is unsurprising that the majority opinion does not embrace this aspect of
 
 Redrick
 
 's reasoning.
 

 Warren
 
 disregarded the harm-to-property language in
 
 Giles
 
 and
 
 Douglas
 
 on grounds that those decisions were issued by an "intermediate-appellate court" and therefore were "not binding." 723 Fed. App'x at 164. But we have held in this Circuit that when, as here, there is an absence of authority from a state's highest court, this Court follows the decisions of intermediate state appellate courts unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise."
 

 Castillo
 
 ,
 
 776 F.3d at
 
 268 n.3 (internal quotation marks omitted). And neither the Government nor the majority opinion points to language in any opinion by the Maryland Court of Appeals indicating that
 
 Giles
 
 's and
 
 Douglas
 
 's characterization of the fear element as encompassing threats to property no longer remains good law. Perhaps for this reason, the majority opinion declines to rely on
 
 any
 
 aspect of
 
 Warren
 
 's reasoning.
 

 Finally,
 
 Segovia
 
 never mentions
 
 Giles
 
 or
 
 Douglas
 
 , much less examines whether harm or threats to property satisfy the fear element, and therefore is even less persuasive.
 
 770 F.3d at 355
 
 .
 

 III.
 

 In sum, the majority opinion follows the district court's legal error by analyzing Defendant's
 
 Miranda
 
 argument from the perspective of the law enforcement officer, not the suspect. And the majority opinion incorrectly holds that Maryland armed robbery categorically constitutes a violent felony for purposes of the ACCA.
 

 Accordingly, I respectfully dissent.
 

 I concur in the majority opinion's judgment that the district court did not abuse its discretion in admitting certain evidence under Federal Rule of Evidence 404(b).
 
 Ante
 
 at 464-65. That rule provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but that such evidence may nonetheless be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).
 

 Here, the district court did not abuse its discretion in concluding that the testimony regarding Defendant's August 25, 2014, arrest, search, and interrogation in Washington, D.C., because there was an adequate factual basis to conclude that the conduct at issue in that arrest was "part of single criminal episode,"
 
 United States v. Chin
 
 ,
 
 83 F.3d 83
 
 , 87-88 (4th Cir. 1996), and was "necessary to complete the story of the crime at trial,"
 
 United States v. Siegel
 
 ,
 
 536 F.3d 306
 
 , 316 (4th Cir. 2008) (internal quotation marks omitted). Most notably, as the majority opinion correctly emphasizes, that the officers found plastic baggies, some of which contained drugs, with the same green dollar sign and blue devil markings in both searches, indicating that both arrests were part of the same series of transactions. Moreover, the two searches of Defendant's home were in close temporal proximity to his arrest.
 

 In rendering its judgment, the majority opinion characterizes Rule 404(b) as "a rule of inclusion."
 
 Ante
 
 at 465. To be sure, this Court has characterized Rule 404(b) as "a rule of inclusion."
 
 United States v. Hall
 
 ,
 
 858 F.3d 254
 
 , 276-77 (4th Cir. 2017). We have done so to make clear that Rule 404(b) 's "list of proper purposes is not exhaustive."
 

 Id.
 

 at 266
 
 , 277 (citing
 
 United States v. Queen
 
 ,
 
 132 F.3d 991
 
 , 994-95 (4th Cir. 1997) ). "That characterization does not displace the longstanding rule"-which predates the
 
 Queen
 
 decision referenced by the majority opinion-"that prior 'bad act' evidence is '
 
 generally inadmissible
 
 .' "
 
 Hall
 
 ,
 
 858 F.3d at 277
 
 (emphasis added) (quoting
 
 United States v. McBride
 
 ,
 
 676 F.3d 385
 
 , 395 (4th Cir. 2012) ). Accordingly, the majority opinion should not-and cannot-be read as holding that other bad acts evidence is presumptively admissible.
 
 See
 

 McMellon v. United States
 
 ,
 
 387 F.3d 329
 
 , 333 (4th Cir. 2004) (en banc) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from the court sitting
 
 en banc
 
 or the Supreme Court.").
 

 I further concur in the majority opinion's judgment that the district court did not abuse its discretion by refusing to compel the government to disclose the identity of a confidential informant.
 
 Ante
 
 at 466-67. In rendering its judgment, the majority opinion states that "[t]he district court denied [Defendant's] motion because [Defendant] failed to meet his 'heavy burden to demonstrate the need for identification,' as would allow him to pierce the informer's privilege."
 
 Ante
 
 at 466. The majority opinion's reference to a "heavy burden" simply quotes the district court's opinion, it does not state-much less establish-the standard applied by the Supreme Court or this Court in reviewing motions to compel identification of a confidential informant.
 

 Id.
 

 As the majority opinion correctly states, that standard is governed by the balancing test set forth in
 
 Roviaro v. United States
 
 ,
 
 353 U.S. 53
 
 , 59,
 
 77 S.Ct. 623
 
 ,
 
 1 L.Ed.2d 639
 
 (1957), and applied by this Court in
 
 United States v. Gray
 
 ,
 
 47 F.3d 1359
 
 , 1364-65 (4th Cir. 1995). Neither
 
 Roviaro
 
 nor
 
 Gray
 
 characterize a Defendant's burden in propounding such a motion as "heavy."
 

 At several points the majority opinion emphasizes that the question was "relating to officer safety."
 
 Ante
 
 at 462, 463. Whether Special Agent Oliver's
 
 intent
 
 in asking the question was to protect the safety of the officers searching the residence does not resolve whether the question amounted to interrogation for purposes of
 
 Miranda
 
 -an inquiry that "focuses primarily upon the perceptions of the suspect,
 
 rather than the intent of the police
 
 ."
 
 Innis
 
 ,
 
 446 U.S. at 301
 
 ,
 
 100 S.Ct. 1682
 
 (emphasis added).
 

 To be sure,
 
 Miranda
 
 's "public safety exception" permits law enforcement officers to ask questions, without giving
 
 Miranda
 
 's prophylactic warnings, if doing so is necessary to protect the officers or the public from immediate danger.
 
 See
 

 United States v. Mobley
 
 ,
 
 40 F.3d 688
 
 , 692 (4th Cir. 1994). This Court has held that the public safety exception "must be construed narrowly" and "applies
 
 only
 
 where there is 'an objectively reasonable need to protect the police or the public from an
 
 immediate danger
 
 associated with [a] weapon.' "
 

 Id.
 

 at 693
 
 (emphasis added) (quoting
 
 New York v. Quarles
 
 ,
 
 467 U.S. 649
 
 , 659 n.8,
 
 104 S.Ct. 2626
 
 ,
 
 81 L.Ed.2d 550
 
 (1984) ).
 

 Tellingly, the majority opinion does not uphold the district court's separate conclusion that Defendant's statements were admissible under the public safety exception. J.A. 393. For good reason; this case is on all fours with
 
 Mobley
 
 , in which this Court declined to apply the public safety exception. There, law enforcement officers executed a search warrant at the defendant's apartment.
 
 Mobley
 
 ,
 
 40 F.3d at 690
 
 . After the officers had completed a "security sweep" of the apartment and placed the defendant under arrest, the officers asked the defendant "if there was anything in the apartment and specifically any weapons that were in the apartment that could be of danger to the agents" who were conducting the search.
 

 Id.
 

 at 690-91
 
 . This Court concluded that, under these facts, the government failed to demonstrate "an 'immediate need' that would validate" application of the public safety exception.
 

 Id.
 

 at 693
 
 .
 

 Like in
 
 Mobley
 
 , when Special Agent Oliver asked the question regarding weapons, the Emergency Services Team had finished performing their protective sweep and Defendant and his wife were handcuffed and under the control of the officers. Accordingly, without endangering themselves or others, the law enforcement officers could have advised Defendant of his
 
 Miranda
 
 rights before asking if there were any dangerous objects in the homes. Therefore, there was no "immediate need" warranting application of the public safety exception.
 

 After concluding that Special Agent Oliver did not expressly question Defendant, the majority opinion further concludes that Defendant was not subjected to the "functional equivalent" of express questioning.
 
 Ante
 
 at 463-64. In particular, the majority opinion states "[i]t can hardly be said that overhearing a single question posed to one's spouse creates the necessary level of compulsion without more" to amount to the functional equivalent of express questioning.
 
 Id.
 
 at 464. The majority opinion offers no legal authority in support of this assertion, nor does the majority opinion examine the coerciveness of the questioning from
 
 Defendant's perspective
 
 , as
 
 Innis
 
 requires.
 
 446 U.S. at 301
 
 ,
 
 100 S.Ct. 1682
 
 . And one can easily imagine situations in which law enforcement officers directing questions at a suspect's spouse or other family member would be "reasonably likely to elicit an incriminating response from the suspect."
 
 Innis
 
 ,
 
 446 U.S. at 301
 
 ,
 
 100 S.Ct. 1682
 
 .
 

 Additionally, the majority opinion errantly treats the district court's assertion that Defendant " 'volunteered' his answer" as relevant to the
 
 Miranda
 
 inquiry, notwithstanding that the Supreme Court has held that "
 
 Miranda
 
 's procedural safeguards exist precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake."
 
 J.D.B. v. North Carolina
 
 ,
 
 564 U.S. 261
 
 , 281,
 
 131 S.Ct. 2394
 
 ,
 
 180 L.Ed.2d 310
 
 (2011).